**Ernest BRAZIL, Plaintiff–Appellant,**

v.

**UNITED STATES DEPARTMENT of the NAVY, and Secretary of the Navy, et al., Defendants–Appellees.**

No. 92–16615.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 14, 1995.

Decided Sept. 15, 1995.

had obtained PRP certification by December of 1988, when he was assigned to Kilauea.

On May 18, 1989, Kilauea captain Bruce Butterfield paid Brazil off the ship and recommended that the Navy revoke his PRP certification. Butterfield cited as justification several disciplinary and interpersonal problems which he alleged Brazil had been involved in during his six months on board, including run-ins with Philippine and military police, verbal and physical altercations with other mariners, an unfavorable performance review and displays of disrespect toward superiors.

In response, Brazil filed a complaint with the Equal Employment Opportunity Commission (EEOC), alleging that in recommending revocation of his PRP certification, Butterfield discriminated on the basis of race (Brazil is black). Although the initial investigator assigned to Brazil's case recommended a finding of discrimination, the Navy ultimately issued a final finding of no discrimination. The EEOC affirmed this finding on administrative appeal.

In July, 1990, while Brazil's EEOC complaint was pending, the Navy terminated his employment on grounds of insubordination and threats to civilian employees. The insubordination charge arose as a result of Brazil's apparent refusal to accept assignment to another ship until his complaint had been resolved.[2] The Navy also claimed that Brazil had threatened to harm other employees while he was stationed in California awaiting resolution of his EEOC claim and reassignment.

Brazil then filed this action in district court, alleging that the Navy discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5, by revoking his PRP certification. Brazil here urges that his

Vickie L. Henry, Crosby, Heafey, Roach & May, Oakland, CA, for plaintiff-appellant.

E. Roy Hawkens, U.S. Dept. of Justice, Washington, DC, for defendant-appellee.

Before SNEED, CANBY, and FERNANDEZ, Circuit Judges.

CANBY, Circuit Judge:

In this case we must decide whether a federal court may, in the context of a Title VII discrimination case, review the Executive's decision to revoke a security clearance or the equivalent thereof. We conclude that the court lacks jurisdiction to conduct such a review, and we therefore affirm the district court's grant of summary judgment in favor of the Department of the Navy.

**FACTS AND PROCEDURE**

Mr. Ernest Brazil was a civilian employee of the United States Navy's Military Sealift Command, and was assigned to the ship USNS Kilauea on station in the Philippines. Because Kilauea is capable of carrying nuclear weapons, the Navy requires that each member of its crew hold a Nuclear Weapons Personnel Reliability Program (PRP) certification[1] as a condition of employment. Brazil

1. A PRP certification is an accreditation to work around sensitive nuclear material, and is a prerequisite to employment in certain capacities or on certain Navy ships. Certification is awarded only after rigorous screening and background checks and is intended to be a predictor of the holder's reliability in dealing with the nuclear material. Although PRP certification is not the same as a security clearance, the Navy is anxious

to treat it as such, and Brazil acquiesces. Thus we will treat PRP certification and security clearance decisions as equivalent for purposes of this opinion.

2. PRP Certification is not required for many civilian postings on other Military Sealift Command ships and installations.

pleadings *in pro per* also embodied a claim for his ultimate termination from employment. The Navy moved for summary judgment, arguing that a Title VII analysis would necessarily require the court to review the merits of its decision to revoke Brazil's security clearance, and that such a review was precluded by law. The district court agreed and granted summary judgment in favor of the Navy. It did not address the issue of Brazil's later termination from employment.

## ANALYSIS

### I. The Reviewability of Security Clearance Decisions in a Title VII Action.[3]

■ The Supreme Court's holding in *Department of the Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), and our own in *Dorfmont v. Brown*, 913 F.2d 1399 (9th Cir.1990), *cert. denied*, 499 U.S. 905, 111 S.Ct. 1104, 113 L.Ed.2d 214 (1991), preclude judicial review of security clearance decisions made by the Executive or his delegee. That bar to review applies equally, we conclude, in the context of a Title VII discrimination action.

Although *Egan* prohibited only outside administrative board review of security clearance decisions, it provided the base from which *Dorfmont* extended its bar to judicial review. The court in *Egan* explained that, while there ordinarily might be a strong presumption favoring appellate review of administrative decisions, that presumption is negated when it conflicts with national security concerns. *Egan*, 484 U.S. at 527, 108 S.Ct. at 824; *see also Dorfmont*, 913 F.2d at 1401 (summarizing *Egan*).

At the core of *Egan's* deference to the national security mission is the recognition that security clearance determinations are "sensitive and inherently discretionary" exercises, entrusted by law to the Executive. *Egan*, 484 U.S. at 527–29, 108 S.Ct. at 823–25. The Court in *Egan* pointed out that security clearance decisions are highly uncertain, and heavily dependent on the ability of the decision-maker to predict the future be-

havior of the applicant. Thus the Court elected to leave the "[p]redictive judgment of this kind" to "those with the necessary expertise in protecting [the sensitive material]," rather than in the hands of "an outside non-expert body." *Id.* at 529, 108 S.Ct. at 825.

In *Dorfmont*, we held that the Supreme Court's reasoning on the reviewability of security clearance decisions "applie[d] no less to the federal courts than to [administrative review boards]." *Dorfmont*, 913 F.2d at 1401. "When it comes to security matters, a federal court is 'an outside nonexpert body.' We have no more business reviewing the merits of a decision to grant or revoke a security clearance than does [a merit review board]." *Id.* Thus in *Dorfmont* we held broadly that judicial review, like outside administrative review, of security clearance decisions was precluded:

> The Department of Defense revoked [plaintiff]'s security clearance. The Department derives its authority directly from the President. The decision to grant or revoke a security clearance is committed to the discretion of the President by law. The district court therefore cannot review the merits of the department's decision to revoke [plaintiff]'s security clearance.

*Id.* (internal citations omitted). Although Brazil's circumstances may be compelling, he asks the court to do exactly what *Egan* and *Dorfmont* forbid, for we find that in this case a Title VII analysis necessarily requires the court to perform some review of the merits of the security clearance decision.

■ Analysis of a Title VII discrimination claim advances according to a three-step process. Under Title VII, a plaintiff has the initial burden of pleading a *prima facie* case of disparate treatment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). If the plaintiff is successful, the burden of production shifts to the defendant to provide legitimate, nondiscriminatory reasons for its actions. *Id.* at 802–04, 93 S.Ct. at 1824–25. Finally, should the defendant produce such

---

**3.** We review *de novo* grants of summary judgment. *Jesinger v. Nevada Fed. Credit Union*, 24

F.3d 1127, 1130 (9th Cir.1994).

legitimate, nondiscriminatory reasons, the burden is then on the plaintiff to establish by a preponderance of the evidence that the defendant's supposedly legitimate reasons were in fact a pretext to mask an illegal motive. *Id.*

After finding that Brazil had made a *prima facie* case of discrimination satisfying step one of the Title VII analysis, the district court concluded that it could not perform step two to determine whether the Navy's proffered reasons for its decision were legitimate without necessarily reviewing the merits of that decision. The court's conclusion was correct.

The second and third steps of the Title VII analysis present an insurmountable hurdle for Brazil. It is impossible for the court to establish in the first place whether the Navy's proffered reasons were legitimate without evaluating their merits. Even if the court were able to get by step two, it is very likely to be impossible for it to proceed to step three and determine whether the given reasons were mere pretext without considering their merits. The district court thus properly applied *Dorfmont* in granting the Navy's motion for summary judgment.

Brazil argues that Title VII analysis does not involve a review of the merits because it does not require the court to determine whether the Navy's reasons for revoking his clearance were valid; it merely requires a determination of whether the proffered reasons were the actual reasons. We disagree. The more valid a reason appears upon evaluation, the less likely a court will be to find that reason pretextual; the converse is also true. Even when the court faces independent evidence of a discriminatory motive, it is still necessary to weigh the validity of the defendant's proffered reasons when deciding if they are pretextual. In short, the merit of such decisions simply cannot be wholly divorced from a determination of whether they are legitimate or pretextual. We therefore reject Brazil's argument.

Brazil finally asserts that *Dorfmont* and *Egan* do not control here because Congress has specifically provided for our review of Title VII claims arising from security clearance decisions that are brought by civilian employees of the military. In support of his position, Brazil relies on section 717(a) of Title VII, which provides that *"[a]ll personnel actions* affecting employees ... in military departments ... shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a) (emphasis added). According to Brazil, the use of the phrase "all personnel actions" demonstrates Congress' specific intent to include security clearance decisions within the scope of Title VII judicial review.

■ Like other courts before us, we are unconvinced by this argument. Neither the express language nor the legislative history of Title VII is as persuasive or definitive as Brazil urges. The provision does not "by its terms ... confer broad authority" on the federal courts to review security clearance decisions. *Egan,* 484 U.S. at 530, 108 S.Ct. at 825; *see also Guillot v. Garrett,* 970 F.2d 1320, 1325 (4th Cir.1992) (holding that section 717 of Title VII does not "evidence the kind of unmistakable expression of purpose" necessary to conclude that Congress intended security clearance decisions to be subject to judicial review). We therefore reject this argument as well.

## II. The *Bivens* Claim.

■ In the alternative to his Title VII claim, Brazil asserts a direct constitutional challenge—a *Bivens* claim—to the Navy's action; he claims that the Navy's decision to revoke his clearance denied him equal protection as guaranteed by the Fifth Amendment. *Bivens*-type actions, however, are unavailable where the claim involves employment discrimination and the plaintiff is a civilian employee of the military.

■ In *Brown v. General Servs. Admin.,* 425 U.S. 820, 835, 96 S.Ct. 1961, 1969, 48 L.Ed.2d 402 (1976), the Supreme Court held that Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment." While the Supreme Court has created narrow exceptions to *Brown* for certain federal employees who would otherwise be without a remedy, *see Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (because Congress had explicitly ex-

empted its staffers from coverage under Title VII, *Bivens*-type Equal Protection claim allowed), the rule is that "where Congress has designed a program that provides what it considers adequate remedial mechanisms for constitutional violations, *Bivens* actions should not be implied." *Kotarski v. Cooper,* 866 F.2d 311, 312 (9th Cir.1989) (summarizing *Schweiker v. Chilicky,* 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988)). "So long as Congress' failure to provide money damages, or other significant relief, has not been inadvertent, courts should defer to its judgment, because 'Congress is the body charged with making the inevitable compromises required in the design of a massive and complex ... program.'" *Id.,* 866 F.2d at 312 (quoting *Chilicky* ).

■ We conclude that Brazil's circumstances parallel those of the plaintiffs in *Kotarski* and *Chilicky.* Brazil is covered by the "massive and complex program" of Title VII in all areas of discrimination *except* for that relatively narrow area dealing with security clearance decisions. Congress provided some mechanism for reviewing all personnel decisions negatively affecting Brazil save for those related to national security. It cannot be said that failure to provide complete relief was "inadvertent." The district court correctly found that it could not hear Brazil's *Bivens* claim.

### III. Appealability of Brazil's final termination.

■ In addition to his claim involving the Navy's revocation of his PRP certification, Brazil argues that his action has always contained a companion claim for retaliatory discharge under Title VII, and that the district court erred by failing to address it in the ruling. We conclude that a fair reading of the complaint does not include a claim for retaliatory discharge.

Brazil filed and prosecuted his action *in pro per.* He used a form complaint where he simply filled in the blanks when information was requested. Such forms are, of course, fairly inflexible. They ask questions that are not tailored to a plaintiff's individual situation, and then they do not allow litigants the room to expand on answers when the questions don't quite fit.

For example, when faced with the following question on the complaint form:

. . . .

4. The acts complained of in this suit concern:

   A.——Failure to employ me.

   B.——Termination of my employment.

   C.——Failure to promote me.

. . . .

Brazil answered by checking selection B— "Termination of my employment." By this he could have meant revocation of his security clearance, as no other choice seems to better capture that possibility. He could also have meant that he was indeed complaining of his final termination. Finally, he could have intended to complain of both actions. If we were forced to judge from the rather ambiguous answer to question Four alone, we might liberally construe Brazil's pleading in favor of the *pro se* litigant, *United States v. Ten Thousand Dollars,* 860 F.2d 1511, 1513 (9th Cir.1988), and find that he had intended to complain of his ultimate termination. However, we do not decide the question in a vacuum; the pleadings as a whole lead us to a different conclusion.

Question Seven on the form complaint asks, "The alleged discrimination occurred on or about," and then leaves a short space for the plaintiff to fill in. Brazil answered by entering the date "May 1989," the month that Butterfield paid him off the Kilauea and recommended that his PRP certification be revoked. That date is fully fourteen months before Brazil was terminated from employment.

Question Six on the form asks the plaintiff to state the basic facts surrounding his claim. Brazil's response deals entirely with the revocation of his PRP certification and his administrative battle to regain it. Nowhere in the response is his final termination mentioned. Finally, in his Response to Defendant's Answer, Brazil addressed only incidents surrounding his shipboard discipline and PRP revocation. Again, he did not mention his ultimate termination.

Although a *pro se* litigant like Brazil may be entitled to great leeway when the court construes his pleadings, those pleadings nonetheless must meet some minimum threshold in providing a defendant with notice of what it is that it allegedly did wrong. Brazil's complaint, fairly read, gave the Navy no inkling that he wished to bring his ultimate termination before the district court for review. We therefore find that the issue was not raised below; it is waived on appeal.

**AFFIRMED.**